FILED

1  **REESE RICHMAN LLP**
2  Michael R. Reese (State Bar No. 206773)    2013 FEB 26 PM 3: 45
   875 Avenue of the Americas, 18th Floor
3  New York, New York 10001                   CLERK U.S. DISTRICT COURT
                                              CENTRAL DIST. OF CALIF.
4  Telephone:  (212) 643-0500                 LOS ANGELES
   Facsimile:  (212) 253-4272                 BY:_____
5  Email:      mreese@reeserichman.com

6  **THE KREISLER LAW FIRM LLC**
7  Brian T. Kreisler (admitted *pro hac vice*)
   P.O. Box 1353
8  O'Fallon, Illinois 62269
9  Telephone:  (618) 589-2165
   Facsimile:  (618) 632-5095
10 Email:      Brian@kreislerlawfirm.com
11
   *Counsel for Plaintiffs and the Proposed Class*
12
13            **UNITED STATES DISTRICT COURT**
14            **CENTRAL DISTRICT OF CALIFORNIA**
15                  **WESTERN DIVISION**
16

| | |
|---|---|
| 17  ADAM PARKER and ANDREW HARBUT, on behalf of themselves and all others similarly situated, | Case No. 12-CV-1983 TJH (OPx) |
| 18 | |
| 19 | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| 20                                    Plaintiffs, | |
| 21 | **DEMAND FOR JURY TRIAL** |
| 22                  v. | |
| 23  MONAVIE, INC.; MONAVIE LLC; and JUICEY ACAI, LLC, | |
| 24 | |
| 25 | |
| 26                                    Defendants. | |

27
28

Plaintiff Andrew Harbut ("Plaintiff"), on behalf of himself and all others similarly situated (the "Class," further defined herein), allege the following against defendants MonaVie, Inc. and MonaVie LLC (together, "MonaVie"), along with Juicey Acai, LLC ("Juicey Acai") (collectively with MonaVie, "Defendants"), upon personal knowledge as to himself and his own acts, and as to all other matters upon information and belief, based upon, *inter alia*, the investigation made by his attorneys, as follows:

## INTRODUCTION

1.      Defendants and other beverage distributors market and sell MonaVie açaí juice products ("MonaVie" or the "Products," further defined herein) through a multi-level marketing scheme that disseminates false and misleading representations that the Products provide certain clinically-proven health benefits regarding the immune system.      Unfortunately for consumers, Defendants knowingly fabricate such statements with no legitimate basis and overcharge consumers for fruit juice that provides no more health benefits than other, significantly less expensive fruit juices.

2.      The Products addressed herein include MonaVie Original, MonaVie Essential, MonaVie Active, MonaVie Pulse, MonaVie (M)mūn, MonaVie Kosher, and MonaVie E.

3.      The Products cost at least $39.00 for a bottle of approximately 25 ounces, and consumers can purchase them through MonaVie's website, http://www.monavie.com, and MonaVie's distributors, including Defendant Juicey Acai.

4.      Defendants' scheme for hawking this overpriced fruit juice is almost identical to that of another "health" drink product called Royal Tongan Limu, which was manufactured and distributed by multi-level marketing company Dynamic Essentials. The Food and Drug Administration ("FDA") forced Dynamic Essentials to cease and desist operations as a result of the unsubstantiated claims of therapeutic benefits of Royal Tongan Limu espoused by Dynamic Essentials and its distributors.

5.     After the FDA caused Dynamic Essentials to shut down, Dallin Larsen – Dynamic Essentials's Vice President and the creator of the Royal Tongan Limu juice – moved on to create MonaVie and the Products and marketing scheme at issue here.

6.     Contrary to the misrepresentations made by Defendants, MonaVie is aware that no reliable clinical studies exist regarding açaí juice products. Indeed, according to an internal company document authored by Ralph Carson – the purported creator of MonaVie's açaí juice and one-time "Chief Science Officer" – the juice is "expensive flavored water. Any claims made are purely hypothetical, unsubstantiated and, quite frankly, bogus."[1]

7.     Furthermore, the FDA admonished MonaVie in 2007 for some of the same health claims that Defendants still make.[2]  In particular, the FDA warned that claims about the ability of MonaVie's products to cure, mitigate, treat, or prevent disease, even though such claims were unsubstantiated by any valid medical research, were serious violations of the Federal Food, Drug, and Cosmetic Act (FFDCA) and the applicable regulations promulgated pursuant to the FFDCA.

8.     Nevertheless, MonaVie makes claims on its website that its Products can "aid [one's] body in the fight against aging" and provide unique benefits to consumers' immune systems, hearts, and joints.

9.     As further detailed below, Plaintiff purchased MonaVie in reliance upon such false, unfair, deceptive, and/or unconscionable representations, which Plaintiff saw and heard through Defendants' mass marketing and advertising campaign. If

---

[1] Tom Harvey, *Utah juice companies offer few prospects*, The Salt Lake Tribune, Dec. 13, 2011, http://www.sltrib.com/sltrib/mobile/53061545-90/monavie-company-distributors-percent.html.csp.

[2] *See* FDA Warning Letter to Kevin Vokes and MonaVie (July 6, 2007), http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/CyberLetters/ucm056937.pdf.

1 Plaintiff had known that Defendants' representations were false and misleading and
2 that he was essentially paying for overpriced fruit juice, Plaintiff would not have
3 purchased MonaVie.

4      10.    The purpose of this lawsuit is to stop Defendants' fraudulent and
5 deceptive practices and redress the harm done to consumers.

6 **JURISDICTION AND VENUE**

7      11.    This Court has original jurisdiction over this class action under 28 U.S.C.
8 § 1332(d), which explicitly provides for the original jurisdiction of the Federal Courts
9 in any class action where any member of the plaintiff class is a citizen of a State
10 different from the State of citizenship of any defendant, and in which the matter in
11 controversy exceeds the sum of $5,000,000, exclusive of interest and costs. Plaintiff
12 Harbut is a citizen of Missouri, whereas defendants MonaVie, Inc. and MonaVie LLC
13 are citizens of Utah, and defendant Juicey Acai, LLC is a citizen of California.
14 Therefore, diversity of citizenship exists under CAFA.

15      12.    Venue is proper in this District under 28 U.S.C. § 1391(a). Plaintiff
16 Harbut purchased the Product from Defendant Juicey Acai which maintains its
17 headquarters within this District, and a substantial part of the events or omissions
18 giving rise to Plaintiff Harbut's claims occurred within this District.

19 **PARTIES**

20      13.    Plaintiff Andrew Harbut is an individual consumer who, at all times
21 relevant to this lawsuit and the allegations contained herein, was a resident of
22 Missouri. Mr. Harbut made an online purchase of MonaVie (M)mūn from Defendant
23 Juicey Acai, LLC on September 29, 2011. The purchase was in the amount of $42.45.
24 The item was shipped to Mr. Harbut at his home in St. Louis, Missouri. Prior to
25 purchasing the MonaVie Product, Mr. Harbut saw, heard, and relied upon
26 advertisements, representations, and statements made by Defendants. Specifically,
27 Mr. Harbut read Monavie's website located at http://www.monavie.com on or about
28 September 29, 2011 before making his purchase of MonaVie (M)mūn.    On

Monavie's website Mr. Harbut read and relied upon the following statements in deciding to purchase the MonaVie Product:

### "DAILY DEFENSE FOR A HEALTHIER LIFE

Safeguard. Optimize. Shield.™ The SOS approach of MonaVie (M)mūn arms your body against everyday challenges. Featuring a body-beneficial blend of 19 fruits and Wellmune®—a clinically proven beta-glucan shown to strengthen your body's immune defenses—this scientifically advanced juice combats cellular oxidation while helping protect your body year round.

### KEY BENEFITS

- Improves physical and mental well being
- Optimizes your immune system
- Helps safeguard your body from potentially harmful microorganisms
- Fights oxidative damage and the signs of aging"

\*     \*     \*

"Daily defense for a healthier life. Monavie (M)mūn is a body-beneficial blend of 19 fruits and Wellmune, which has been clinically shown to strengthen your body's immune defenses. Formulated with AcaVie – the purest, most patent form of Acai available – this scientifically advanced juice combats cellular oxidation while helping protect your body year round. Optimize your body's natural defenses with MonaVie (M)mūn today."

\*     \*     \*

"Every MonaVie health juice features an exclusive blend of the Brazilian acai berry – one of nature's superfoods – and 18 other nutrient-dense, body-beneficial fruits from around the world. Scientific research validates the incredible antioxidant power of acai."

Mr. Harbut also read and relied upon the following statements on Defendant JuiceyAcai's website, http://juiceyacai.com on or about September 29, 2011 in deciding to make his purchase of the MonaVie (M)mūn Product:

## DAILY DEFENSE FOR A HEALTHIER LIFE

Safeguard. Optimize. Shield.™ The SOS approach of MonaVie (M)mūn arms your body against everyday challenges. Featuring a body-beneficial blend of 19 fruits and Wellmune®—a clinically proven beta-glucan shown to strengthen your body's immune defenses—this scientifically advanced juice combats cellular oxidation while helping protect your body year round.

## KEY BENEFITS

- Improves physical and mental well being
- Optimizes your immune system
- Helps safeguard your body from potentially harmful microorganisms
- Fights oxidative damage and the signs of aging

* * *

"Daily defense for a healthier life.  Monavie (M)mūn is a body-beneficial blend of 19 fruits and Wellmune, which has been clinically shown to strengthen your body's immune defenses.  Formulated with AcaVie – the purest, most patent form of Acai available – this scientifically advanced juice combats cellular oxidation while helping protect your body year round.  Optimize your body's natural defenses with MonaVie (M)mūn today."[3]

Mr. Harbut relied upon these statements to believe that MonaVie is clinically proven to strengthen his body's immune system, and based upon those statements, decided to purchase the (M)mūn Product.  However, as seen below, these statements are misleading and false, as MonaVie is not clinically proven to strengthen one's immune system.  Indeed, as admitted by Defendant's former "Chief Science Officer" and the purported creator of MonAvie, MonAvie is nothing more than "expensive flavored water. Any claims are purely hypothetical, unsubstantiated and, quite frankly, bogus."  And as explained by Dr. Michael Starnbach in a report by the Harvard

---

[3] http://juiceyacai.com/product_info.php?products_id=81

1  Medical School entitled "The Truth About Your Immune System": "Many product on
2  store shelves claim to boost or support immunity.  But the concept of boosting
3  immunity actually makes little sense scientifically….There isn't any evidence-based
4  science behind the concept of "boosting" immunity beyond what our finely tune
5  immune system already provides.  Without that evidence-based research, these claims
6  on food and drink packaging are just a marketing ploy".

7        Mr. Harbut would not have purchased the Product had he known that the
8  representations made by Defendants were false and misleading.  As a result, Mr.
9  Harbut suffered injury in fact and lost money due to Defendants' violations of the law
10  described herein.  Additionally, despite consuming the (M)mūn product, Mr. Harbut
11  experienced none of the dramatic improvements in his health that Defendants
12  represented would occur from consuming the product.

13        14.     Defendant MonaVie, Inc. is a Utah corporation with its principal place of
14  business at 10855 South River Front Parkway, Suite 100, South Jordan, Utah 84095.
15  MonaVie, Inc. is in the business of advertising, selling, and distributing the MonaVie
16  Products and has been so engaged at all times relevant to the allegations contained
17  herein.

18        15.     Defendant MonaVie LLC is a limited liability company organized under
19  the laws of the state of Delaware with its principal place of business at 10855 South
20  River Front Parkway, Suite 100, South Jordan, Utah 84095.  MonaVie LLC is in the
21  business of advertising, selling, and distributing the MonaVie Products and has been
22  so engaged at all times relevant to the allegations contained herein.  MonaVie LLC
23  reportedly generated more than $2 billion in revenue from 2005 to 2010, according to
24  its CEO, Dallin Larsen.[4]

25  _____

26  [4] *See* Tom Harvey, *Utah juice companies offer few prospects*, The Salt Lake Tribune,
27  Dec. 13, 2011, http://www.sltrib.com/sltrib/mobile/53061545-90/monavie-company-
   distributors-percent.html.csp.

28

1      16.    Defendant Juicey Acai, LLC is a limited liability company organized

2  under the laws of the state of California with its principal place of business at 20652

3  Gelman Drive, Riverside, California 92508.  Juicey Acai, LLC distributes in the

4  business of introducing and selling the MonaVie Products online in the United States

5  and internationally and has been so engaged at all times relevant to the allegations

6  contained herein.

7

8

9

10  **COMMON FACTUAL ALLEGATIONS**

11  **False Immune System Claims**

12      17.    MonaVie makes false and misleading representations on its website that

13  is repeated on the labels of its Products.  For example, as seen below in a picture of

14  Plaintiff Harbut's bottle of MonaVie (M)mūn, the bottle has the following claim on it:

15          Daily defense for a healthier life.  MonaVie (M)mūn™ is a body-

16          beneficial blend of 19 fruits and Wellmune®, which has been clinically shown to strengthen your body's immune defenses.

17          Formulated with AçaVie™ – a proprietary açai complex packed

18          with free radical fighting antioxidants – this scientifically advanced juice combats cellular oxidation while helping protect

19          your body year round.  Optimize your body's natural defenses

20          with MonaVie (M)mūn today.

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15      18.     Defendant Juicey Acai mirrors this language on its website where it
16  states:

17  "Daily defense for a healthier life. Monavie (M)mūn is a body-beneficial blend of 19
18  fruits and Wellmune, which has been clinically shown to strengthen your body's
19  immune defenses. Formulated with AcaVie – the purest, most patent form of Acai
20  available – this scientifically advanced juice combats cellular oxidation while helping
21  protect your body year round. Optimize your body's natural defenses with MonaVie
22  (M)mūn today."[5]

23      19.     These representations on the Products and on distributor websites,
24  including the name of the (M)mūn Product, which is pronounced "immune," convey
25  to consumers that the Products can provide certain health benefits.

26  _____

27  [5] http://juiceyacai.com/product_info.php?products_id=81 (last visited June 25, 2012).
28

20.    These statements lead reasonable consumers to believe that MonaVie is clinically proven to strengthen, improve or otherwise boost their immune systems. However, as seen below, these statements are misleading and false, as MonaVie is not clinically proven to strengthen, improve or otherwise boost one's immune system.

21.    Indeed, Defendant's former "Chief Science Officer" and the purported creator of MonAvie, MonAvie is nothing more than "expensive flavored water. Any claims are purely hypothetical, unsubstantiated and, quite frankly, bogus."

22.    Likewise, a Harvard Medical School Special Health Report, "The Truth About Your Immune System," states that the body's immune system protects individuals "from infectious bacteria, viruses, fungi, and parasites that cause disease, suffering, and death."[6] "The immune system is, collectively, the cells, molecules, and tissues that get the job done. The immune response is how they do it. Immunity–protection against infectious disease–is the end product."[7] The immune system is complex. Accordingly, "[t]here is still much that researchers don't know about the intricacies and interconnectedness of the immune response. For now, there are no scientifically proven direct links between diet or lifestyle and enhanced immune function."[8]

23.    Indeed, the Harvard Medical Report "The Truth About Your Immune System" goes on to state that: "Many product on store shelves claim to boost or support immunity. But the concept of boosting immunity actually makes little sense scientifically….There isn't any evidence-based science behind the concept of

---

[6] Michael N. Starnbach (ed.), Harvard Medical School, *The Truth About Your Immune System* (2010) ("Harvard Report"), at 1, *available at* http://www.health.harvard.edu/special_health_reports/the-truth-about-your-immune-system.

[7] *Id.*

[8] *Id.* at 26.

"boosting" immunity beyond what our finely tune immune system already provides. Without that evidence-based research, these claims on food and drink packaging are just a marketing ploy".[9]

24.    Indeed, unfortunately for consumers, antioxidant supplementation can have *adverse health effects*.  For this reason, the Harvard Medical School recently advised consumers: *"Do not take antioxidant supplements."*[10]

25.    Moreover, MonaVie and its distributors encourage daily consumption of the Products beyond one serving a day.  Therefore, even supposing the Products do provide some sort of benefit to consumers' immune systems, the amount of consumption recommended by Defendants could be harmful because an overactive immune system attacks the body's own healthy tissues.

26.    For this reason, the Federal Trade Commission ("FTC") and the FDA have sought to put a halt to such claims.  As discussed above, the FDA sent a warning letter to MonaVie and one of its distributors in 2007 regarding unauthorized representations about purported health benefits.

27.    In 2008, the FTC settled a lawsuit against the makers of Airborne, who agreed to pay up to $30 million in regard to claims that their Airborne products could help treat the common cold when, in reality, the products were just overpriced, run-of-the-mill vitamin pills.[11]  Similarly to how Defendants market the MonaVie Products, marketing materials for Airborne touted it as a unique formula of "Herbal Extracts, Antioxidants, Electrolytes, and Amino Acids" that offered protection against illness.[12]

---

[9] *Id.* at 28.

[10] Harvard Medical School, *Supplements: A Scorecard*, Harvard Men's Health Watch, Apr. 2012, at 2 (emphasis added).

[11] *See* http://www.ftc.gov/opa/2008/08/airborne.shtm.

[12] *See. e.g.*, http://www.ftc.gov/os/caselist/0723183/080814airbornecomplaint.pdf 34.

28.    In July 2009, the FTC announced that national pharmacy chain Rite Aid Corporation had agreed to pay $500,000 to settle FTC charges regarding false and misleading claims that its "Germ Defense" tablets and lozenges could prevent and treat colds and the flu or reduce the severity and duration of illness.[13]

29.    In September 2009, the FTC announced that national retailer CVS Pharmacy Inc. had agreed to pay $2.8 million to settle FTC charges regarding false and misleading claims that its "AirShield" dietary supplements could prevent colds, fight germs, and boost one's immune system.[14]

30.    In March 2010, national pharmacy chain Walgreens agreed to pay nearly $6 million to settle FTC charges regarding false and misleading claims that its "Wal-Born" products – a line of dietary supplements similar to the Airborne cold-and-flu treatment –could prevent colds, fight germs, and boost one's immune system.[15]

31.    Despite all these cases and the FDA's specific admonishment regarding the marketing of MonaVie's products, MonaVie and its distributors continue to market and sell the MonaVie Products as having health and medicinal benefits that they do not have, and Defendants make such representations knowing that they have insufficient evidence to support them.

32.    Distributors clearly take their cues from MonaVie itself, though, which has been sued before for its false and misleading representations.

33.    Despite knowing that its distributors, including Defendant Juicey Acai, were engaging in or planned to engage in the violations of law described in this Complaint, MonaVie facilitated the commission of those unlawful acts.  MonaVie intended to and did encourage, facilitate, or assist in the commission of the unlawful

---

[13] *See* http://www.ftc.gov/opa/2009/07/riteaide.shtm.

[14] *See* http://www.ftc.gov/opa/2009/09/cvs.shtm.

[15] *See* http://www.ftc.gov/opa/2010/03/walgreens.shtm.

1   acts and thereby aided and abetted its distributors, including Defendant Juicey Acai, in

2   the unlawful conduct.

3                          **False and Deceptive Use of the**

4                   **Oxygen Radical Absorbance Capacity Scale**

5       34.    On its website, MonaVie emphasizes the "Oxygen Radical Absorbance

6   Capacity" ("ORAC") value of its Products to make health benefit claims, but such

7   claims are misleading and/or medically, statistically, and scientifically unsound.

8       35.    ORAC is determined by a laboratory analysis that measures the total

9   antioxidant power – *i.e.*, ability to neutralize oxygen free radicals – of foods and other

10  chemical substances. ORAC testing is a way to measure how many oxygen radicals a

11  specific food can absorb and, thereby, neutralize. The more oxygen radicals a food

12  can absorb, the higher its ORAC "score."

13      36.    MonaVie represents that the "açaí berry is the crown jewel of the

14  MonaVie blend. When properly freeze-dried, açaí boasts an ORAC score higher than

15  that of any other fruit or vegetable tested to date, based on available USDA data."[16]

16      37.    Similarly, on its website, MonaVie states that "freeze-dried Acai and

17  Jucara are far and away more ORAC rich than many dehydrated fruits and

18  vegetables."[17]   Directly following a chart demonstrating this representation, the

19  website then states:

20

21

22

23  [16] *See, e.g.*, MONAVIE AND MONAVIE GEL, PRODUCT INFORMATION
24  PAGE, available at
25  https://www.monavievo.com/corporate/documents/MonaVie%20Original%20PIP_
    4-14-08.pdf.
26
    [17] MonaVie Business Intelligence, *MBI – What does ORAC Mean?*, Apr. 16, 2012,
27  http://www.monavie.com/news/view/mbi--what-does-orac-mean-.

28

> Insight: MonaVie's premier juice blends contain powerful
> nutrients that aid your body in the fight against aging and other
> symptoms of oxidative stress. In fact, just four ounces provide
> you with the antioxidant capacity of approximately 13 servings of
> common fruits and vegetables.[18]

38.    MonaVie's emphasis on ORAC is misleading, in part because there is no industry standard for measuring ORAC scores. Furthermore, different growing and harvesting conditions, including the season and temperature, also influence the ORAC score of a particular plant by as much as fourfold. The ORAC score can be influenced by how the plant material is dealt with – for instance, cooking, freezing, and storage.

39.    When comparing ORAC data, care must be taken to ensure that the units and food being compared are similar. Some evaluations compare ORAC units per grams dry weight, others evaluate ORAC units' wet weight, and others compare ORAC units per serving. Under each evaluation, different foods can appear to have higher ORAC scores. Although a raisin has no more antioxidant potential than the grape from which it was dried, raisins will appear to have a much higher ORAC value per gram wet weight than grapes due to their reduced water content. Likewise, the large water content of watermelons can make it appear as though they are very low in antioxidants. In short, to accurately compare ORAC scores, one must consider the amount of water in the food sample. The more water, the lower the ORAC score per gram of that food. When something is freeze-dried, the water is removed. With all the water weight taken out, a nutrient-dense power remains, resulting in relatively high ORAC scores.

40.    Furthermore, MonaVie's representations about ORAC are misleading because there is a limit to the benefits a person may derive from antioxidant intake. A significant increase in antioxidants of 15 to 20 percent is possible by increasing

_____

[18] *Id.*

consumption of fruits and vegetables, particularly those high in ORAC value. However, MonaVie fails to disclaim that, in order to have a significant impact on plasma and tissue antioxidant capacity, one can only meaningfully increase one's daily intake by 3,000 to 5,000 ORAC units. Any greater amount is not efficacious because the antioxidant capacity of the blood is tightly regulated. Thus, there is an upper limit to the benefit that can be derived from antioxidants. Taking in 25,000 ORAC units at one time would be no more beneficial than taking in a fifth of that amount; the excess is simply excreted by the kidneys.

41. While MonaVie uses ORAC scores to claim that four ounces of its Products is the antioxidant equivalent of eating 13 common fruits, thereby giving the perception that drinking four ounces of MonaVie is equivalent to eating 13 fruits, MonaVie does not provide any disclaimer that would address the issues identified above.

42. While MonaVie also references various studies on its website to back up its claims, there are no reliable studies on commercially available products containing açaí. The studies MonaVie used are medically, statistically, and scientifically unsound and, thereby, misleading.

43. In an independent study commissioned by *Men's Journal* to test various fruit juices, MonaVie scored poorly on all criteria.[19] The criteria were phenolic acids, which purportedly help prevent cancer; anthocyanins, which purportedly help prevent aging; Vitamin C, which purportedly aids in healing wounds; and beta-carotene, which purportedly supports the immune system. MonaVie tested "extremely low in anthocyanins and phenolics. Even apple juice (which also tested poorly) has more

---

[19] *See* Jamie Beckman, *Superjuices on Trial*, Men's Journal, Dec. 4, 2008, *available at* http://archive.mensjournal.com/superjuices-on-trial; *see also Men's Journal Proves MonaVie Lacks Nutrition*, http://www.juicescam.com/mens-journal-proves-monavie-lacks-nutrition.

phenolics than [MonaVie's] juice.  Plus, MonaVie's vitamin C level was five times lower than that of Welch's Grape Juice. That's not many nutrients, especially at $1.20 a serving."[20]

44.    MonaVie is just an expensive way to potentially get an amount of antioxidants that a consumer could obtain from much cheaper sources. The MonaVie Products sell for about $40 for a 25.3 ounce bottle, or about $4 to $6 per day if the Product is used as directed on the bottle. According to many published studies in the National Institute of Medicine database on ORAC scores for all kinds of fruits and vegetables, the ones that tend to be the highest include blueberries, raspberries, kale, spinach, prunes, and others, none of which cost nearly as much as MonaVie Products. Organically grown blueberries, for instance, are more available, much less expensive, and provide much fiber as well as plenty of antioxidant activity.

45.    Furthermore, while the açaí berry has a value of 161,400 units per 100 grams, a common household spice such as cinnamon has an ORAC value of 267,536 units per 100 grams, and ground cinnamon is much cheaper than açaí juices even though it has comparable health benefits.

46.    Additionally, Wellmune, the main ingredient of (M)mūn, is a registered trademark of Biothera and is another name for WGP 3-6. Sixty pills of WGP 3-6 at 250 mg strength can be purchased for less than $20 and can last for about two months, which makes it a much cheaper alternative to the $45 MonaVie bottle, which only lasts one week.[21]

---

[20] *Id.*

[21]  *See*  MonaVie  Scam  –  MonaVie's  Wellmune  Is  Cheaply  Available, http://www.juicescam.com/monavies-wellmune-is-cheaply-available/ (last visited June 25, 2012).

**Misleading Claims Based on Polyphenol Content**

47.    Polyphenols are antioxidants in plants that many believe confer substantial health benefits. They work by neutralizing free radicals, which are known to cause a number of health problems. They may protect against some common health problems and possibly certain effects of aging. They can also block the action of enzymes that cancer needs for growth and can deactivate substances that promote the growth of cancer.

48.    Regarding the purported benefits of polyphenols in its Products, MonaVie states the following:

> Dedicated to unlocking, sharing, and protecting the earth's most unique, health-giving resources, *MonaVie combines science and nature to bring you the highest quality products possible.*
>
> •Based upon millions of dollars in clinical research
> •Supported by more than 60 independent scientific studies
> * * *
> Though your body inherently creates some antioxidants, these life-protecting phytonutrients are generally found in richly pigmented fruits and vegetables. *While thousands of antioxidants are found in nature, polyphenol and flavonoids (a class of polyphenols) are two of the most effective.*
>
> * * *
>
> Polyphenols are natural chemicals responsible for the color, flavor, and scent in fruits and vegetables. *Deeply pigmented berries such as açai are especially high in these antioxidant compounds.* Found mostly in the outer layer of fruits, polyphenols offer protection from harmful bacteria and ultraviolet light. *In humans, polyphenols protect your body from oxidative damage and support cardiovascular health.*[22]

_____

[22] http://www.monavie.com/products/health-juices ("Science" tab (emphasis added)).

49.     Contrary to the scientific research to which MonaVie refers, there is no evidence that fruit polyphenols have antioxidant effects in the human body.[23]

50.     Dr. Peter Hoffman, an associate professor at RIKILT, which is an institute of food safety at Wageningen University in the Netherlands, has spent thirty years researching polyphenols.  Dr. Hoffman has concluded that polyphenols do not work as antioxidants when ingested in foods and supplements because the human body makes enough of its own.[24]

## CLASS ALLEGATIONS

51.     This action has been brought, and may be properly maintained, under Federal Rule of Civil Procedure 23(a)(1)-(4), (b)(2), and (b)(3).

52.     Plaintiff brings this action as a class action, on behalf of himself and all others similarly situated, initially defined to be all persons who purchased the MonaVie Products for the sole purpose of personal consumption from November 13, 2008, to the date of class certification (the "Class Period").  Excluded from the Class are Defendants; members of the immediate families of the officers and directors of Defendants; their legal representatives, heirs, successors, or assigns; any entity in which they have or have had a controlling interest; and any entity that purchased MonaVie Products for resale.

---

[23] *See* European Food Safety Authority, *Scientific Opinion on the substantiation of health claims related to various food(s)/food constituent(s) and protection of cells from premature aging, antioxidant activity, antioxidant content and antioxidant properties, and protection of DNA, proteins and lipids from oxidative damage pursuant to Article 13(1) of Regulation (EC) No 1924/2006*, EFSA Journal 2010, *available at* http://www.efsa.europa.eu/en/scdocs/doc/1489.pdf (discussing demonstrated effect *in vitro* but not *in vivo*); Shane Starling, *Veteran researcher: Polyphenols don't work as antioxidants in vivo, but...*, Nutraingredients.com Newsletter, Jul. 12, 2010, *available at* http://www.nutraingredients.com/ Research/Veteran-researcher-Polyphenols-don-t-work-as-antioxidants-in-vivo-but.
[24] *Id.*

53. Plaintiff Harbut also brings this action on behalf of a sub-class of Missouri residents who purchased MonaVie Products for the purpose of personal consumption during the Class Period (the "Missouri Sub-Class") and on behalf of persons who bought the Products in California, including from companies based in California (the California Sub-Class")(collectively, "Classes").

54. **Numerosity** – Fed. R. Civ. P. 23(a)(1): The members of the Classes are so numerous and widely dispersed that joinder of them in one action is impractical. On information and belief, thousands of individuals throughout the United States have purchased MonaVie Products.

55. **Existence and Predominance of Common Questions of Law and Fact** – Fed. R. Civ. P. 23(a)(2); 23(b)(3): Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting only individual Class members. These common legal and factual questions include, but are not limited to, the following:

      a.    whether MonaVie engaged in an overarching scheme between itself and its distributors to wrongfully profit by creating and approving false and/or misleading advertisements and statements about the health benefits of the Products;

      b.    whether the purpose of the MonaVie scheme is to increase sales of the Products and, thus, the profits of all participants in the scheme;

      c.    whether Defendants created false or misleading advertisements and/or statements about the Products that were made public;

      d.    whether MonaVie concealed, suppressed, or omitted material information about the lack of proven benefits of the Products;

      e.    whether MonaVie had a duty to be honest and forthright with consumers about the lack of proven benefits of the Products;

f.    whether MonaVie allowed its trademark or corporate identity to
be used on false or misleading advertisements or statements about
the Products;

g.    whether the representations about the content of the Products by
Defendants were accurate; and

h.    whether the representations about the nutritional contents of the
Products by Defendants are provable by generally accepted,
laboratory-based scientific analysis.

56.    **Typicality –** Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of the
claims of the Class because Plaintiff, like all other members of the Class, purchased
MonaVie in a typical consumer setting and sustained damages from Defendants'
wrongful conduct.  Thus, the claims of Plaintiff and other members of the Class are
based on the same legal theories and arise from the same unlawful and willful
conduct.

57.    **Adequacy of Representation –** Fed. R. Civ. P. 23(a)(4): Plaintiff is an
adequate representative of the Class because his interests do not conflict with the
interests of the other Class members they seek to represent.  Plaintiff has retained
competent and experienced class action counsel who intend to vigorously prosecute
the action. The Class members' interests will be fairly and adequately protected by
Plaintiff and his counsel.

58.    **Injunctive Relief –** Fed. R. Civ. P. 23(b)(2): The prerequisites to
maintaining a class action for injunctive or equitable relief are met as Defendants have
acted or refused to act on grounds generally applicable to the Class, thereby making
appropriate final injunctive or equitable relief with respect to the Class as a whole.

59.    **Superiority –** A class action is superior to other available methods for
the fair and efficient adjudication of this controversy since joinder of all the Class
members is impracticable.  The amount at stake for each consumer is such that
individual litigation would be inefficient and cost prohibitive.  Additionally, the

adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the claims asserted herein. There will be no difficulty in the management of this action as a class action.

60.    **Notice** – Plaintiff and his counsel anticipate that notice to the proposed Class will be effectuated by publication in major newspapers and on the Internet.

## CAUSES OF ACTION

## COUNT I

### (Fraud, Deceit, and Misrepresentation)

61.    Plaintiff incorporates by reference and realleges all paragraphs previously alleged herein.

62.    Defendants, through their labeling, advertising, and marketing of the Products, make representations and offers regarding the quality of their products as described above.  Defendants engaged and continue to engage in such fraudulent, misrepresentative, false, and/or deceptive acts with full knowledge that such acts were, and are, in fact, misrepresentative, false, or deceptive.

63.    The aforementioned fraud, misrepresentations, deceptive, and/or false acts and omissions concern material facts that are essential to the analysis undertaken by Plaintiff and those similarly situated in deciding whether to purchase Defendants' Products.

64.    Plaintiff and those similarly situated would have acted differently had they not been misled – *i.e.* they would not have paid money for the Products in the first place or they would not have paid the exorbitant premium for the Products.

65.    Defendants have a duty to correct the misinformation they disseminate through their advertising of the Products.  By not informing Plaintiff and those similarly situated, Defendants breached this duty.  Defendants also gained financially from and as a result of this breach.

66.    By and through such fraud, deceit, misrepresentations, and/or omissions, Defendants intended to induce Plaintiff and those similarly situated to alter their positions to their detriment.

67.    Plaintiff and those similarly situated justifiably and reasonably relied on Defendants' misrepresentations, and, as such, were damaged by Defendants.

68.    As a direct and proximate result of Defendants' fraud, deceit, and/or misrepresentations, Plaintiff and those similarly situated have suffered damages in an amount equal to the amount they paid for Defendants' Products. The exact amount of this difference will be proven at trial.

69.    Defendants acted with intent to defraud or with reckless or negligent disregard of the rights of Plaintiff and those similarly situated.

70.    THEREFORE, Plaintiff prays for relief as set forth below.

## COUNT II

## (Violation of Utah Consumer Sales Practices Act)

71.    Plaintiff incorporates by reference and realleges all paragraphs previously alleged herein.

72.    At all relevant times, purchases by Plaintiff and the other Class members of Defendants' Products constituted "consumer transactions" within the meaning of the Utah Consumer Sales Practices Act (UCSPA), Utah Code Ann. §§ 13-11-1 *et seq.*, because such purchases constituted sales of goods to persons (1) primarily for personal, family, or household purposes or (2) for purposes that related to a business opportunity that required expenditure of money or property by the purchaser and required the purchaser to perform personal services on a continuing basis and in which the purchaser had not been previously engaged.

73.    At all relevant times, each Defendant was a "supplier," as that term is defined in Section 3, subsection 6 of the UCSPA, Utah Code Ann. § 13-11-3(6), as they were each and all sellers, lessors, assignors, offerors, brokers, or other persons who regularly solicited, engaged in, or enforced consumer transactions.

74.    As described in detail above, Defendants uniformly misrepresented to Plaintiff and each member of the Class, by means of advertising, marketing, and other promotional materials, including the Products' labeling and packaging, that the Products had particular health benefits that they did not.

75.    Defendants have thereby – in their manufacturing, advertising, marketing, selling, and distribution of the Products – engaged in practices that constitute deception, fraud, false pretense, false promise, misrepresentation, unfair practice, and/or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce. Therefore, Defendants have engaged in unconscionable acts or practices in connection with a consumer transaction in violation of the UCSPA, Utah Code Ann. § 13-11-5.

76.    As a direct and proximate result of Defendants' improper conduct, Plaintiff and the other members of the Class have suffered damages and ascertainable losses of moneys and/or property, in amounts to be determined by the Court or jury, by paying more for the Products than they would have and/or by purchasing the Products when they would not have if the benefits of the Products had not been misrepresented.

77.    THEREFORE, Plaintiff prays for relief as set forth below.

## COUNT III

### (Violation of Missouri's Merchandising Practices Act)

### (on behalf of Missouri Sub-Class)

78.    Plaintiff incorporates by reference and realleges all paragraphs previously alleged herein.

79.    Plaintiff brings this cause of action on behalf of himself and the Missouri Sub-Class.

80.    Section 2 of the Missouri's Merchandising Practices Act (MMPA), Mo. Rev. Stat. § 407.010, provides the following:

1
2
3
4
5
6

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . in or from the state of Missouri, is declared to be an unlawful practice. . . . Any act, use or employment declared unlawful by this subsection violates this subsection whether committed before, during or after the sale, advertisement or solicitation.

7     81.    At all relevant times, each Defendant was and is a "person," as that term
8  is defined by MMPA § 1(5), Mo. Rev. Stat. § 407.010(5), because each is a
9  "partnership, firm, for-profit or not-for-profit corporation, whether domestic or
10 foreign, company, foundation, trust, business entity or association."

11    82.    At all relevant times, the MonaVie Products constituted "merchandise,"
12 as that term is defined by MMPA § 1(4), Mo. Rev. Stat. § 407.010(4), because the
13 Products are "objects, wares, goods, [or] commodities."

14    83.    At all relevant times, Defendants' manufacturing, marketing, advertising,
15 sales and/or distribution of MonaVie Products met the definition of "sale" set forth by
16 MMPA § 1(6), Mo. Rev. Stat. § 407.010(6), because such manufacturing, marketing,
17 advertising, sales, and/or distribution constituted a "sale, lease, offer for sale or lease,
18 or attempt to sell or lease merchandise for cash or on credit."

19    84.    At all relevant times, Defendants' manufacturing, marketing, advertising,
20 sales, and/or distribution of MonaVie Products met the definition of "advertisement"
21 set forth by MMPA § 1(1), Mo. Rev. Stat. § 407.010(1), because such manufacturing,
22 marketing, advertising, sales, and/or distribution constituted an "attempt by
23 publication, dissemination, solicitation, circulation, or any other means to induce,
24 directly or indirectly, any person to enter into any obligation or acquire any title or
25 interest in any merchandise."

26    85.    At all relevant times, Defendants' sale or advertisement of the
27 merchandise at issue occurred in "trade" or "commerce," as those terms are defined in
28 MMPA § 1(7), Mo. Rev. Stat. § 407.010(7), because such sale or advertisement

constituted "the advertising, offering for sale, sale, or distribution, or any combination thereof, of any services and any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value wherever situated." Additionally, such sale or advertisement directly or indirectly affected the people of Missouri, which is conduct explicitly included in the definition of "'[t]rade' or 'commerce'" set forth in MMPA § 1(7).

86. As described in detail above, Defendants uniformly misrepresented to Plaintiff Harbut and each member of the Missouri Sub-Class, by means of advertising, marketing, and other promotional materials, and on the Products' labeling and packaging, that the Products had particular health benefits that they did not.

87. Defendants have thereby – in their manufacturing, advertising, marketing, selling, and distribution of the Products, as detailed herein – engaged in practices that constitute deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce. Therefore, Defendants have violated the Missouri Merchandising Practices Act, Mo. Rev. Stat. §§ 407.010 *et seq.*

88. As a direct and proximate result of Defendants' improper conduct, Plaintiff Harbut and other members of the Missouri Sub-Class have suffered damages and ascertainable losses of moneys and/or property, in amounts to be determined by the Court or jury, by paying more for the Products than they would have and/or by purchasing the Products when they would not have if the benefits of the Products had not been misrepresented.

89. THEREFORE, Plaintiff Harbut prays for relief as set forth below.

## COUNT IV

### (Violation of California's Consumers Legal Remedies Act)
### (on behalf of California Sub-Class)

90.     Plaintiff incorporates by reference and realleges all paragraphs previously alleged herein.

91.     This cause of action is brought pursuant to the California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.* (the "CLRA"), on behalf of Plaintiff Harbut and the California Sub-Class.

92.     Plaintiff and the other members of the California Sub-Class are "consumers," as that term is defined by California Civil Code § 1761(d), because they bought MonaVie Products for personal, family, or household purposes.

93.     Plaintiff , the other members of the California Sub-Class, and Defendants have engaged in "transactions," as that term is defined by California Civil Code §1761(e).

94.     The conduct alleged in this complaint constitutes unfair methods of competition and unfair and deceptive acts and practices for the purpose of the CLRA, and the conduct was undertaken by Defendants in transactions intended to result in, and which did result in, the sale of goods to consumers.

95.     As alleged more fully above, Defendants have violated the CLRA by falsely representing to Plaintiff and the other California Sub-Class members that MonaVie Products had certain benefits that they do not have.

96.     As a result of engaging in such conduct, Defendants have violated California Civil Code § 1770(a)(5), (a)(7), and (a)(9).

97.     The unfair and deceptive acts and practices of Defendants, as described above, present a serious threat to Plaintiff and other members of the California Sub-Class.

1    98.   Plaintiff and the other members of the California Sub-Class may be
2 irreparably harmed and/or denied an effective and complete remedy if such an order is
3 not granted.

4    99.   THEREFORE, Plaintiff prays for relief as set forth below.

5                                  **COUNT V**

6              **(Violation of California's False Advertising Law)**

7                  **(on behalf of California Sub-Class)**

8    100.   Plaintiff incorporates by reference and realleges all paragraphs previously
9 alleged herein.

10   101.   Plaintiff brings this cause of action on behalf of himself and the other
11 members of the California Sub-Class.

12   102.   As alleged above, Defendants – in violation of California's False
13 Advertising Law ("FAL"), California Business and Professions Code §§ 17500 *et seq.*
14 – have falsely advertised and marketed MonaVie Products by falsely claiming that the
15 Products had certain benefits that they do not have.

16   103.   Plaintiff and the other members of the California Sub-Class have suffered
17 injury in fact and have lost money or property as a result of Defendants' violations of
18 the FAL.

19   104.   THEREFORE, Plaintiff prays for relief as set forth below.

20                                 **COUNT VI**

21             **(Violation of California's Unfair Competition Law)**

22                 **(on behalf of California Sub-Class)**

23   105.   Plaintiff incorporates by reference and realleges all paragraphs previously
24 alleged herein.

25   106.   By committing the acts and practices alleged herein, Defendants have
26 engaged in deceptive, unfair, and unlawful business practices – in violation of
27 California's Unfair Competition Law ("UCL"), California Business and Professions
28 Code §§ 17200 *et seq.* – as to the Class as a whole.

107.   Defendants have violated the UCL's proscription against engaging in unlawful conduct as a result of (i) their violations of the CLRA, Cal. Civ. Code § 1770(a)(5), (a)(7), and (a)(9), as alleged above, and (ii) their violations of the FAL, Cal. Bus. & Prof. Code §§ 17500 *et seq.*, as alleged above.

108.   In addition, Defendants have violated the UCL's proscription against engaging in unlawful conduct as a result of their violations of the Sherman Law, Cal. Health & Safety Code §§ 109875 *et seq.*, which forbids (1) misbranding of any food or drug, *id.* §§ 10398 and 111445, and (2) manufacturing, selling, delivering, holding, or offering for sale any food or drug that is misbranded or delivering or proffering such for delivery, *id.* §§110770 and 111450.

109.   The Sherman Law provides that a product is misbranded "if its labeling is false or misleading in any particular." *Id.* § 110660.  In determining whether the labeling or advertisement of a food, drug, device, or cosmetic is misleading, all representations made or suggested by statement, word, design, device, sound, or any combination of these, shall be taken into account.  The extent that the labeling or advertising fails to reveal facts concerning the food, drug, device, or cosmetic or consequences of customary use of the food, drug, device, or cosmetic shall also be considered. *Id.* § 110290.

110.   Defendants' acts and practices described above also violate the UCL's proscription against engaging in fraudulent conduct.

111.   As more fully described above, Defendants' misleading marketing, advertising, packaging, and labeling of the MonaVie Products is likely to deceive reasonable consumers.  Indeed, Plaintiff and the other members of the California Sub-Class were unquestionably deceived regarding the health benefits of the Products, as Defendants' marketing, advertising, packaging, and labeling of the Products misrepresent and/or omit the true facts concerning the benefits of the Products.  Said acts are fraudulent business practices.

1    112.   Defendants' acts and practices described above also violate the UCL's

2    proscription against engaging in unfair conduct.

3    113.   Plaintiff and the other members of the California Sub-Class who

4    purchased MonaVie Products suffered a substantial injury by virtue of buying a

5    product they would not have purchased absent Defendants' unlawful, fraudulent, and

6    unfair marketing, advertising, packaging, and labeling or by paying an excessive

7    premium price for the unlawfully, fraudulently, and unfairly marketed, advertised,

8    packaged, and labeled Products.

9    114.   There is no benefit to consumers or competition from deceptively

10   marketing and labeling dietary supplements.  Indeed, the harm to consumers and

11   competition is substantial.

12   115.   Plaintiff and the other members of the California Sub-Class who

13   purchased MonaVie Products had no way of reasonably knowing that the Products

14   they purchased were not as marketed, advertised, packaged, and labeled.  Thus, they

15   could not have reasonably avoided the injury each of them suffered.

16   116.   The gravity of the consequences of Defendants' conduct as described

17   above  outweighs  any  justification,  motive,  or  reason  therefore,  particularly

18   considering the available legal alternatives that exist in the marketplace, and such

19   conduct is immoral, unethical, unscrupulous, offends established public policy, and/or

20   is substantially injurious to Plaintiff and the other members of the California

21   Sub-Class.

22   117.   Defendants' violations of the UCL continue to this day.

23   118.   THEREFORE, Plaintiff prays for relief as set forth below.

24

25

26

27

28

## COUNT VII

### (Violation of the Magnuson-Moss Act)

119.   Plaintiff incorporates by reference and realleges all paragraphs previously alleged herein.

120.   The Magnuson-Moss Warranty-Federal Trade Commission Improvement Act (the "Magnuson-Moss Act"), 15 U.S.C. §§ 2301 *et seq.*, provides in section 110(d)(1) that "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under [the Magnuson-Moss Act], or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief."  15 U.S.C. § 2310(d)(1).

121.   At all relevant times, Plaintiff and the other Class members were "consumers," as that term is defined in 15 U.S.C. § 2301(3), because each was "a buyer (other than for purposes of resale) of any consumer product, any person to whom such product is transferred during the duration of an implied or written warranty (or service contract) applicable to the product, and any other person who is entitled by the terms of such warranty (or service contract) or under applicable State law to enforce against the warrantor (or service contractor) the obligations of the warranty (or service contract)."

122.   At all relevant times, Defendants were "suppliers," as that term is defined in 15 U.S.C. § 2301(4), because each was a "person engaged in the business of making a consumer product directly or indirectly available to consumers."  Although the Magnuson-Moss Act does not define "person," case law applies the Magnuson-Moss Act to businesses as well as individuals.

123.   At all relevant times, Defendants were "warrantors," as that term is defined in 15 U.S.C. § 2301(5), because each was a "supplier or other person who gives or offers to give a written warranty or who is or may be obligated under an implied warranty."

1    124.    The MonaVie Products purchased by Plaintiff and the other Class

2 members were "consumer products," as that term is defined in 15 U.S.C. § 2301(6),

3 because the MonaVie Products were "tangible personal property which is distributed

4 in commerce and which is normally used for personal, family, or household

5 purposes."

6    125.    By reason of Defendants' breach of their express warranties regarding the

7 ability of their Products to strengthen the body's immune system and aid the body in

8 fighting against aging and various diseases, Defendants have caused economic

9 damage to Plaintiff and the other Class members and have violated the statutory rights

10 due to them under the Magnuson-Moss Act.

11    126.    THEREFORE, Plaintiff prays for relief as set forth below.

12                                    **PRAYER FOR RELIEF**

13    WHEREFORE, Plaintiff demands judgment on behalf of himself and the Class

14 as follows:

15    A.    An Order certifying the proposed Class and the proposed California

16 Sub-Class and Missouri Sub-Class under Rules 23(a), 23(b)(2), and (b)(3) of the

17 Federal Rule of Civil Procedure; appointment of Plaintiff as representative of the

18 Class and Missouri and California Sub-Classes; and appointment of Plaintiff's

19 undersigned counsel as counsel for the Class and Sub-Classes;

20    B.    An Order declaring that Defendants are financially responsible for

21 notifying Class members of the pendency of this suit;

22    C.    An Order establishing Defendants as constructive trustees of the profits

23 that served to unjustly enrich them, together with interest during the period in which

24 Defendants retained such funds;

25    D.    For injunctive relief and monetary relief pursuant to California Civil Code

26 § 1780;

27

28

E.     An Order providing injunctive relief, pursuant to California Civil Code § 1780(a)(2) and (a)(5) and pursuant to California Business and Professions Code §§ 17203 and 17535 requiring Defendants to:

      1.     remove language on the MonaVie Products' packaging representing that the Products strengthen the body's immune system and/or aid the body in fighting against aging or various diseases;

      2.     remove language on the MonaVie Products' packaging representing that the Products provide any health benefit that cannot be substantiated by reliable scientific studies;

      3.     provide restitution to the members of the California Sub-Class; and

      4.     disgorge all revenues obtained as a result of Defendants' violations of Utah and California law;

F.     An Order awarding declaratory and injunctive relief on a class-wide basis under Utah Code Ann. §§ 13-11-1 *et seq*;

G.     An Order awarding statutory damages in the maximum amount provided by law;

H.     An Order awarding monetary damages, including, but not limited to, any compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury, with respect to the common law claims alleged;

I.     An Order awarding compensatory damages, the amount of which is to be determined by the Court or jury;

J.     An Order awarding punitive damages in accordance with proof and in an amount consistent with applicable precedent;

K.     An Order awarding interest at the maximum allowable legal rate on the forgoing sums;

1   L. An Order awarding Plaintiff his reasonable costs and expenses of suit,

2 including his attorneys' fees; and

3   M. Such further relief as this Court may deem just and proper.

4        **<u>JURY TRIAL DEMANDED</u>**

5  Plaintiff hereby demands a trial by jury.

6 Dated: February 26, 2013    **REESE RICHMAN LLP**

7

8           Michael R. Reese (State Bar No. 206773)

9           875 Avenue of the Americas, 18th Floor
New York, New York 10001

10          Telephone: (212) 643-0500
Facsimile: (212) 253-4272

11          Email:  mreese@reeserichman.com

12

13          - and -

14          **THE KREISLER LAW FIRM LLC**
Brian T. Kreisler (admitted *pro hac vice*)

15          P.O. Box 1353
O'Fallon, Illinois 62269

16          Telephone: (618) 589-2165

17          Facsimile: (618) 632-5095
Email:  Brian@kreislerlawfirm.com

18

19          *Counsel for Plaintiff and Proposed Class*

20

21

22

23

24

25

26

27

28